# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.

**ANDREA CELAYA-RODRIGUEZ,**

    **Defendant.**

:

:

:

**Case No. 2:24-cr-56**
**Chief Judge Sarah D. Morrison**

## OPINION AND ORDER

This matter is before the Court on Defendant Andrea Celaya-Rodriguez's Motion to Suppress. (Mot., ECF No. 32.) The Government responded (Resp., ECF No. 36), and Ms. Celaya-Rodriguez replied (Reply, ECF No. 37-1).[1] For the reasons below, the Motion is **DENIED**.

**I.     BACKGROUND**

While stationed on routine patrol on March 22, 2024, Ohio State Highway Patrol Sergeant Timothy Williamson observed a white box truck driving east on Interstate 70. (Williamson Supp. Rep., ECF No. 36-1, PAGEID # 156–57.) The truck was travelling slowly in the far-right lane and did not have its headlights activated, despite rain. (*Id.*) As the truck passed his cruiser, Sergeant Williamson noticed that the driver was in an "uncomfortable" position, "seated straight up, arms extended out to the steering wheel, and [ ] pushed back trying to hide behind the door pillar."

---

[1] Ms. Celaya-Rodriguez's Motion for Leave to File Reply (ECF No. 37) is **GRANTED**.

(*Id.*, PAGEID # 156.) Sergeant Williamson then began to pursue the truck. (*Id.*, PAGEID # 157.)

As he moved closer, Sergeant Williamson observed the truck change lanes in an "unsafe manner," merging "directly behind [an]other vehicle" such that the truck was "immediately positioned in an unsafe following distance" of only "1–1 ½ car lengths off the rear bumper" of the other vehicle. (*Id.*) He also noticed a "cut-proof lock" on the truck's rear cargo door. (*Id.*) The driver was speaking on a "truck driver style blue-tooth headset" and staring straight ahead with "a look of fear on her face," suggesting to Sergeant Williamson that she was "clearly uncomfortable" with his presence. (*Id.*) Despite light traffic conditions, Sergeant Williamson then observed the truck move in behind a semi and "maintain[] a following distance of approximately 2–3 car lengths off the rear bumper . . . at a speed of 65-70 miles per hour." (*Id.*; Def.'s Ex. E, 13:30:44–54.)

Sergeant Williamson pulled behind the truck and initiated a traffic stop. (Williamson Supp. Rep., PAGEID # 157; Def.'s Ex. E, 13:31:00.) After the truck pulled over, Williamson approached and requested the driver's license and registration. He identified the driver as Ms. Celaya-Rodriguez through her Arizona driver's license. (Williamson Supp. Rep., PAGEID # 157; Def.'s Ex. C, 13:32:00–30.) He asked Ms. Celaya-Rodriguez to turn on her headlights and warned her that she was travelling too close to vehicles she was driving behind. (Def.'s Ex. C, 13:32:12–20.)

Ms. Celaya-Rodriguez told Sergeant Williamson the truck was a rental and provided him with the rental agreement. (Williamson Supp. Rep., PAGEID # 157; Def.'s Ex. C, 13:32:08.) The rental agreement showed that Ms. Celaya-Rodriguez had rented the truck in Tucson three days earlier, and that it was due back in Tucson four days later. (Williamson Supp. Rep., PAGEID # 157.)

When Sergeant Williamson asked Ms. Celaya-Rodriguez about the purpose of her trip, she explained that she was moving to Pennsylvania. (*Id.*; Def.'s Ex. C, 13:32:40–46.) When asked why she would return the truck to Tucson if she was moving to Pennsylvania, Ms. Celaya-Rodriguez responded that she was taking "a little stuff" and going back to Arizona for more belongings. (Def.'s Ex. C, 13:33:23; Williamson Supp. Rep., PAGEID # 157.) Sergeant Williamson found the answer suspicious given the size and cost of the rental truck, which she said was carrying "some sofas and luggage." (Williamson Supp. Rep., PAGEID # 157; Def.'s Ex. C, 13:34:02.) Ms. Celaya-Rodriguez also displayed "signs of high nervousness with the inability to calm down." (Williamson Supp. Rep., PAGEID # 157.)

Sergeant Williamson then informed Ms. Celaya-Rodriguez that he was going to "check some things out" and returned to his patrol car. (Def.'s Ex. C, 13:34:55.) He ran "standardized checks" on her license status and criminal history through the West Jefferson Dispatch Center. (Williamson Supp. Rep., PAGEID # 158; Def.'s Ex. C, 13:35:20.) He then contacted EPIC, the El Paso Intelligence Center,[2] for a "complete check." (Williamson Supp. Rep., PAGEID # 158.)

---

[2] EPIC is a center that "provides information on drivers' licenses, car registrations, and whether an individual has crossed the border at a checkpoint,

3

While Sergeant Williamson was waiting for information from EPIC, Trooper Mike Wilson arrived. (Williamson Supp. Rep., PAGEID # 158; Def.'s Ex. D, 13:45:58.) Trooper Wilson deployed his narcotics canine, Mari, for a free air sniff of the truck. (Williamson Supp. Rep., PAGEID # 158; Def.'s Ex. D, 13:46:05.) Soon after, Trooper Wilson gave Sergeant Williamson a thumbs-up advising Williamson that Mari provided "a positive alert to the presence of narcotics." (Williamson Supp. Rep., PAGEID # 158.)

Trooper Wilson then removed Ms. Celaya-Rodriguez from the truck and the officers conducted a search of the truck, finding 50 kilograms of cocaine in the back. (Williamson Supp. Rep., PAGEID # 158.) The officers arrested Ms. Celaya-Rodriguez. (*Id.*; Def.'s Ex. D, 13:50:30.)

## II. EVIDENTIARY HEARING

Ms. Celaya-Rodriguez requests an evidentiary hearing on her Motion. (Mot., PAGEID # 113.) A defendant "is not always entitled to an evidentiary hearing." *United States v. Lawson*, 476 F. App'x 644, 648 (6th Cir. 2012). Rather, she "must make at least some initial showing of contested facts to be entitled to such a hearing." *Id.* (quoting *United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988)). Courts should grant evidentiary hearings on motions to suppress "when the defendant alleges sufficient facts which if proven would justify relief." *United States v. McGhee*, 161 F. App'x 441, 444 (6th Cir. 2005) (citation omitted). "In all events, however, a district court can forgo conducting an evidentiary hearing if sufficient

---

was deported, or is under federal investigation." *United States v. Urrieta*, 520 F.3d 569, 571 (6th Cir. 2008).

content remains to support a finding of probable cause after the contested items are set aside." *United States v. Thompson*, 16 F. App'x 340, 344 (6th Cir. 2001).

Ms. Celaya-Rodriguez does not contest any issue of material fact. Instead, she argues: (i) the traffic stop was pretextual because Sergeant Williamson had suspicions of criminal activity before stopping her for the moving violations; (ii) the call to EPIC and dog sniff were not within the scope of the stop and therefore unreasonably prolonged it; and (iii) no exceptions to the warrant requirement permitted the search of her truck. (Mot.; Reply.) Her arguments present only legal disputes, not factual ones.

Because the issues before the Court are entirely legal in nature, the Court sees no need for a hearing. Ms. Celaya-Rodriguez's request for an evidentiary hearing is **DENIED**.

## III. ANALYSIS

The Fourth Amendment protects the "right of the people to be secure ... against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. Ms. Celaya-Rodriguez argues that the traffic stop and search violated the Fourth Amendment. Accordingly, she urges the Court to suppress all evidence recovered in the search. (Mot., PAGEID # 117.)

### A. The Initial Stop

Ms. Celaya-Rodriguez first argues that the traffic stop was pretextual. (*Id.*, PAGEID # 117–19.) She does not challenge whether the moving violations occurred, rather, she argues that it "is not clear from [Sergeant Williamson's] retelling of the infraction when exactly the moving violation occurred." (Mot., PAGEID # 118–19.)

5

She contends that "there are obvious issues with the predicated infractions," but does not identify or explain those issues. (*Id.* at PAGEID # 119.) Rather, she asserts Sergeant Williamson "had suspicions of criminal activity that he wished to investigate, and therefore, initiated a traffic stop under the pretext of enforcing the traffic code." (*Id.*) But it is irrelevant whether the stop was pretextual—the only relevant question is whether Sergeant Williamson had probable cause to stop Ms. Celaya-Rodriguez for a traffic violation. *See United States v. Bailey*, 302 F.3d 652, 656–57 (6th Cir. 2002). The Court finds that he did.

"It is well established that a police officer lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012); *see also United States v. Lyons*, 687 F.3d 754, 763 n.3 (6th Cir. 2012) ("[T]his Circuit applies the higher probable cause standard to traffic stops based on civil infractions, and the lower reasonable suspicion standard to traffic stops based on ongoing criminal activity."). Because probable cause existed to justify the stop, there is no need to address reasonable suspicion.

When an officer has probable cause to believe that a traffic violation has occurred, the resulting traffic stop does not violate the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996). Probable cause exists "where 'the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of

6

reasonable caution in the belief that' an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). In other words, probable cause is "reasonable grounds for [the] belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Determining whether probable cause exists "is fact-dependent and will turn on what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

Courts "focus not on whether a reasonable officer 'would' have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer 'could' have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred[.]" *Id.* at 391.

If the officer has probable cause to believe that a traffic offense has occurred, the stop is permissible "regardless of whether this was the only basis or merely one basis for the stop." *Id.*; *see also Whren,* 517 U.S. at 812–13. "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978); *see also Bailey*, 302 F.3d at 656 ("[A]n officer's actual motivation for making a traffic stop is irrelevant to the constitutionality of that stop."). Pertinent here, "a traffic stop, supported by

probable cause, of a vehicle as to which the officer also has suspicions of more nefarious activity, is not unreasonable because it is based at least in part upon other motivations." *Ferguson*, 8 F.3d at 392; *see also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176, (2000) (noting that "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle").

Sergeant Williamson saw the truck change lanes, positioning itself one to one-and-a-half car lengths behind the rear bumper of another vehicle. Although traffic conditions were light, the truck then moved back into the right lane and positioned itself behind a semi, maintaining a speed of 65–70 miles per hour and a following distance of two-to-three car lengths behind the semi. The truck did not have its headlights on even though it was raining. These actions gave Sergeant Williamson probable cause to initiate the traffic stop.[3] *See Kinlin v. Kline*, 749 F.3d 573, 578 (6th Cir. 2014) (probable cause to initiate stop when vehicle executed sudden lane change that left insufficient space for other cars in lane); *see also United States v. Roberts*, 492 F. Supp. 2d 771, 774 (S.D. Ohio 2005) (Graham, J.) (citing Ohio cases using a guidepost of one car length for every ten miles per hour of speed for safe distance).

## B. Length of the Stop

---

[3] Ohio law requires drivers to make safe lane changes and maintain reasonable following distances. Ohio Revised Code §§ 4511.33(A)(1), 4511.34 (A)(4). Ohio law also requires drivers to turn headlights on when using their windshield wipers in the rain. *Id.* § 4513.03. An officer can only enforce the failure to turn on headlights as a secondary infraction. *Id.*

Ms. Celaya-Rodriguez also argues that Sergeant Williamson's call to EPIC and the dog sniff unreasonably prolonged the stop. (Mot., PAGEID # 119–23.) "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Because addressing the infraction is the purpose of the stop, it must "last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). "An officer may not continue to detain a motorist once the purpose of the traffic stop is complete unless something that occurred during the stop caused the officer to have independent reasonable, articulable suspicion of criminal activity." *United States v. Jones*, 479 F. App'x 705, 708 (6th Cir. 2012) (citation omitted).

Because the Court finds both the call to EPIC and the dog sniff were within the scope of the stop, the officers did not require independent reasonable suspicion.

 1. **The officers did not unreasonably prolong the traffic stop.**

"An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop." *Rodriguez*, 575 U.S. at 355. Requesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation do not exceed the scope of a traffic stop for a speeding violation. *See Hill*,

9

195 F.3d at 269. The EPIC search was how Williamson ran the computer check on Ms. Celaya-Rodriguez to ensure there were no outstanding warrants or other issues. This did not prolong the traffic stop. *See United States v. Campbell*, 511 Fed. App'x 424, 425, 427–28 (6th Cir. 2013) (noting a stop was "diligently pursued" until "a service that conducts a more complete records check than the [local dispatch]" called the Blue Lightning Operations Center [BLOC] returned the officer's call with information); *Urrieta*, 520 F.3d at 572–74 (holding the end of a traffic stop to be three minutes after EPIC returned the officer's call).

A dog sniff "is not an ordinary incident of a traffic stop." *Rodriguez*, 575 U.S. at 356. Even so, "'the use of a well-trained narcotics-detection dog' during a traffic stop does not, in itself, infringe any constitutionally protected privacy interests." *United States v. Bonilla*, 357 F. App'x 693, 695 (6th Cir. 2009) (quoting *Caballes*, 543 U.S. at 409.) Thus, "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'" *Rodriguez*, 575 U.S. at 357. Here, the dog sniff occurred while Sergeant Williamson was waiting on information from EPIC. (Williamson Supp. Rep., PAGEID #158; Def.'s Ex. D, 13:46:05–13:47:12.) Ms. Celaya-Rodriguez does not contest this timeline. (Mot., PAGEID #115–16.) Thus, her traffic stop was not prolonged by the dog sniff. *See United States v. Baxter*, No. 4:17-CR-42-TRM-SKL, 2018 WL 1598950, at *7 (E.D. Tenn. Mar. 13, 2018) (holding traffic stop was not unreasonably prolonged where dog sniff occurred while officers were waiting for BLOC report).

### 2. Ms. Celaya-Rodriguez's remaining arguments to the contrary fail.

Ms. Celaya-Rodriguez's remaining arguments presume that the initial stop ended when Sergeant Williamson completed his standardized checks through the West Jefferson Dispatch Center; she argues that he required reasonable suspicion for the call to EPIC and the dog sniff. (Mot., PAGEID # 121.) In support of this position, she cites to various cases where courts have found that officers detoured from the purpose of the initial stop without the requisite reasonable suspicion. *See, e.g., United States v. Williams*, 68 F.4th 304, 307 (6th Cir. May 17, 2023) (examining whether officer had reasonable suspicion to prolong stop where officer's "initial mission" ended when she concluded her checks on driver and passenger and approached the vehicle for a second time to keep questioning them); *United States v. Taylor*, 121 F.4th 590, 595 (6th Cir. 2024) (examining whether officer had reasonable suspicion to prolong stop where there was no dispute that officer had completed tasks necessary to resolve initial stop). But her case is distinguishable; unlike in *Williams* and *Taylor* where the officer extended the traffic stop after all tasks tied to the traffic infraction had been completed, the stop here was neither completed when the dog sniff occurred nor unreasonably prolonged by it. Accordingly, the Court need not address whether the officers developed reasonable suspicion during the stop.

### C. Vehicle Search

The evidence seized from the search of the truck will not be suppressed because the stop was valid, and the search was reasonable under the automobile

11

exception. The automobile exception to the warrant requirement allows an officer to perform a warrantless search of a detained vehicle when he has probable cause to believe the vehicle contains contraband or evidence of criminal activity. *Lyons*, 687 F.3d at 770. When probable cause is present for the automobile exception, police may search "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009). "[A] positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) (citing *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir.1994)).

Mari provided a positive alert to the presence of narcotics in the truck.[4] Once Mari provided the positive alert, the officers had probable cause to search the truck.

## IV. CONCLUSION

The Motion to Suppress Evidence (ECF No. 32) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[4] Although Ms. Celaya-Rodriguez contends that she "reserved argument" challenging "the sufficiency of the presumed dog alert," she does not make any such argument beyond asserting that the dog sniff "appears highly questionable." (Mot., PAGEID # 129; Reply, PAGEID # 167.) This bare assertion is insufficient to raise the issue. *See United States v. Stepney*, No. 2:23-CR-68, 2024 WL 93200, at *1 n.2 (S.D. Ohio Jan. 9, 2024) (Morrison, J.) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

12